Filed 3/18/13  Young v. Humphrey CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| ANDREA ANN YOUNG, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> LIANE HUMPHREY, <br><br> Defendant and Respondent. | H036803 <br> (Santa Cruz County <br> Super. Ct. No. PR044571) |

Respondent Liane Humphrey is a beneficiary and sole trustee of The Loren F. Humphrey Trust (Trust).  Appellant Andrea Ann Young, who is also a beneficiary of the Trust, filed a petition for accounting, breach of trust, and removal of trustee.[1]  The trial court found that Liane had breached her fiduciary duties.  On appeal, Andrea contends that the trial court erred by failing to properly calculate the measure of damages, by failing to award prejudgment interest, and by failing to award attorney's fees.  We conclude that the trial court did not err and affirm the judgment.

---

[1]     We will refer to the parties by their first names because some individuals share the same surnames.  Liane was Loren's wife and Andrea was his daughter from a previous marriage.

# I. Statement of Facts

## A. The Trust

On March 16, 2004, Loren established the Trust, which he amended on May 29, 2007. Upon Loren's death, Liane was designated the trustee of the Trust. Section 2 of exhibit B to the Trust (Section 2) provided in relevant part that after Loren's debts and expenses were paid, Liane was to "allocate and divide the remaining balance of the Trust Estate into two equal shares" for Andrea and herself. The First Amendment to the Trust (Amendment) provided that, upon Loren's death, the trustee would establish a subtrust for Liane and a subtrust for Andrea, and Liane would be the trustee of her subtrust and Andrea would be trustee of her subtrust.

At the time of Loren's death on June 16, 2007, the major portion of the Trust estate consisted of two parcels of real property: (1) a commercial property that was generating rental income (the Dimeo Lane property); and (2) a residential property where Loren and Liane had lived (the Old San Jose Road property). Section 2 stated in relevant part: "Should the [Old San Jose Road property], be an asset of the Trust Estate upon this allocation and division, and should that asset not comprise more than one-half (1/2) the value of the net Trust Estate following the expenses of the administration of the Trust following the death of the Grantor . . . it is the Grantor's intention that the residence be allocated to the share for his wife. . . . [¶] . . . [¶] Should the [Dimeo Lane property] be an asset of the Trust Estate upon this allocation and division, it is the Grantor's intention that this property be sold as soon as it is reasonable to do so, and the resulting liquid assets be used to fund the share for the Grantor's daughter. [¶] It is the Grantor's further intention that . . . the Trustee shall use the share for the Grantor's daughter to purchase an annuity which will provide guaranteed monthly payments . . . ."

Section 6 of exhibit B to the Trust (Section 6) referred to the deferral of division or distribution of assets and stated: "Whenever the Trustee is directed to make a distribution

of trust assets or division of trust assets into separate trusts or shares on the death of a Grantor, the Trustee may, in the Trustee's discretion, defer that distribution or division until six (6) months after the Grantor's death or for a longer period if the circumstances warrant this delay." The Trust also required Liane to deliver a written accounting "not less frequently than every year after any prior accounting" to each beneficiary.

### B.  The Accountings

Following Loren's death, Liane gathered the Trust assets and had them valued. In the first accounting, the Old San Jose Road property was valued at $820,000 and the Dimeo Lane property was valued at $800,000.

On March 15, 2010, Liane filed the second revised accounting, which covered the period between June 16, 2007 and January 14, 2010. It valued the Trust's assets as of the date of death as follows: Old San Jose Road property - $820,000; Dimeo Lane property - $800,000; mobile home - $45,000; bank accounts - $41,787; investment accounts - $26,545.50; vehicles - $145,384; and personal property - $3,000. Thus, this accounting listed the total amount of assets as $1,881,716.50.

### C.  The Dimeo Lane Property

Prior to his death, Loren had been attempting to sell the Dimeo Lane property by advertising it on Craigslist. This property was located next to the "dump" for the City of Santa Cruz (City) and was zoned commercial/agricultural. The City was interested in the property and had mentioned eminent domain. However, Loren did not want to sell the property to the City because he did not think the City would offer what it was worth. He also did not want the property marketed in Santa Cruz County (County), because he was concerned that prospective buyers might create difficulties in his relationship with the County regarding zoning laws.

3

According to Richard Manning, Loren's attorney, the property had significant disclosure issues and required a lawyer's attention in selling it. One of the tenants had a diesel fuel tank on the property, and the income from the property was attributable to "probably illegal uses." In addition to fill on the property, there were concerns about fuel or oil contamination and the City was conducting periodic tests for methane. Dimeo Lane, which was a paved road, was not owned by either Loren or any public entity. Moreover, the property was not connected to the sewer system and the potability of the water had been questioned.

There were three agreements to purchase the Dimeo Lane property between February 2006 and Loren's death in June 2007. The proposed purchase prices were $1.6 million, $1.4 million, and $1.2 million. Two months after Loren's death, however, the third prospective buyer backed out of the agreement. At this point, Liane began advertising the property on Craigslist, but did not retain a real estate agent.[2] Liane also contacted individuals, including horse ranchers, nursery owners, and landscape suppliers between San Luis Obispo and Redding, because their use of the property would conform to the County codes. When the City offered $500,000 for the property shortly after Loren's death, Liane rejected the offer because it was the same offer that the City had made in 1996. She did not make a counter offer.

In October 2007, Liane informed Andrea that the Dimeo Lane property had been appraised at $765,000. Liane asked Andrea whether she wanted Dimeo Lane distributed to her subtrust in partial satisfaction of her 50 percent share, thereby allowing Andrea to either retain the property or sell it. Shortly thereafter, Andrea informed Liane that she wanted the Dimeo Lane property sold. She also stated that if Liane could not sell the property within four weeks, a real estate broker should be retained to handle the sale. Liane did not retain a real estate broker at that time.

---

[2]     Manning did not assist Liane in the sale of the Dimeo Lane property.

4

In June 2008, Liane decided that she would not sell the Dimeo Lane property. However, she eventually retained a real estate broker and put the property back on the market in December 2009 or January 2010. A couple of months later, the City made an offer. On April 13, 2010, the City entered into a sales agreement in which it agreed to purchase the property from the Trust for $718,300. Escrow closed on July 8, 2010. The net proceeds from the sale of the Dimeo Lane property were $675,202.

The parties stipulated that the Dimeo Lane property did not decrease in value until nine months after Loren died.

### D. The Old San Jose Road Property

After Liane retained a real estate broker, she listed the Old San Jose Road property at $1,055,000 in August 2008. However, property values were decreasing in 2008 and 2009. Properties that were similar to the Old San Jose Road property experienced price reductions and were "taking a span of time to sell in light of the depression of this market." In May 2009, the property was sold for $649,000, and the costs of sale were $35,370.63. Escrow closed in July 2009.

### E. Distributions

Though the Trust required Liane to use Trust assets to fund the subtrusts for herself and Andrea, Liane made distributions of $317,866.19 to herself between June 16, 2007 and January 14, 2010. During the same time period, she made distributions to Andrea of $263,498.79.[3]

---

[3] Andrea later received a vehicle valued at $5,500.

5

## F. Expert Testimony

James Quillinan, a trust and estates attorney, testified as an expert regarding trust administration procedures, standards for fiduciaries, and damages. According to Quillinan, when there is language in the trust that "is directed towards the trustee [to use the funds in a certain manner], unless it's clearly advisory in nature, then the trustee has an obligation to follow the directions." Quillinan testified that Liane had no discretion not to fund the subtrusts or to give herself distributions directly. In his view, if the Old San Jose Road property did not exceed 50 percent of the value of the Trust, it was to be allocated to Liane's share. Thus, the trustee was directed to give this property to Liane and to sell the Dimeo Lane property to purchase an annuity for Andrea.

Quillinan also testified that the Trust assets were to be divided within six months of Loren's death "absent some circumstances that would warrant a delay." In Quillinan's view, Liane breached her fiduciary duty in the following ways: (1) failing to create a separate trust for either herself or Andrea, (2) using Trust money to pay for personal items, medical bills, groceries, items for her children, and her daughter's college expenses, (3) taking out loans on behalf of the Trust for personal use, (4) writing checks to herself from the Trust, (5) failing to divide the Trust estate into two equal shares, (6) failing to sell the Dimeo Lane property in a reasonable time, (7) taking money from the Trust and loaning it at no interest to her daughter, (8) failing to hire a real estate broker to sell the Dimeo Lane property, and (9) failing to sell the Ford F-650 truck, which he characterized as a "wasting asset."

Quillinan testified that the administration of the Trust was "fairly easy" and consequently trustee's and attorney's fees should have been approximately $33,000. According to Quillinan, Andrea's share of the Trust assets would have been $870,000 if the distribution had been completed within six months, and she was also entitled to 10 percent interest on $870,000. Since Andrea had already received about $262,000 and the

Ford Galaxy, she was entitled to approximately $860,000 plus rental income from Liane for the period that she lived in the Old San Jose Road property. Given that the value of the assets remaining in the Trust at the time of trial was $768,202, there were insufficient funds for Andrea's distribution.

Quillinan also testified that the damages calculation assumed that the Trust administration was completed six months after Loren's death and that the Dimeo Lane property sold for its appraised value. Quillinan did not include administrative expenses after six months. However, he did include rental income from the Dimeo Lane property as a Trust asset. The expenses for this property after six months were not included. The Dimeo Lane property rental income for six months was $36,203.23, and the total rental income was $159,139.24.

Quillinan testified that estate planners include clauses like Section 6 into an instrument for alternate valuation purposes. He explained that "if you have a taxable estate, which you don't have here, you have the ability to elect alternate valuation [if] the value had decreased in the intervening six months from the date of death, six months post-mortem. But if you've made a distribution of that asset in that six-month period, you're stuck with the date of distribution for federal estate tax purposes or the date of death value. So it just gives you flexibility for tax planning is really what it's there for. But because of the increase in the exemptions at this time and the fact that the total estate was under two million, there was no tax so the six-month rule wouldn't apply for tax purposes." He also explained that some circumstances warrant a delay longer than six months, such as difficult valuation issues or title problems.

Michael Corman testified as an expert in estate planning and trust administration. Corman drafted the Trust and the Amendment for Loren. According to Corman, Loren did not bequeath the Old San Jose Road property to Liane or the Dimeo Lane property to Andrea. He explained that Loren believed that the Dimeo Lane property was worth more

7

than half of the estate, and thus Loren hoped that Liane would live in the Old San Jose Road property, the Dimeo Lane property would be sold, and the proceeds from the Dimeo Lane property would fund an annuity for Andrea and living expenses for Liane. Corman testified that if Loren had wanted the Old San Jose Road property to be allocated to Liane, the Trust would have stated that the trustee shall allocate the Old San Jose Road property to his surviving spouse. Corman used the term "settlor's intention" as a precatory term. Thus, Corman opined that the trustee had flexibility to sell the Old San Jose Road property and that Andrea would not be prejudiced if her annuity was funded out of one property versus another. Corman knew the City was trying to acquire the Dimeo Lane property by eminent domain, and he thought that the City's interest in acquiring the property drove away buyers.

In Corman's opinion, Liane did not breach her duty by taking a preliminary distribution in the form of a single check to herself from the Trust rather than routing the money first through a subtrust. There was also no breach of her duty in deciding to sell the Old San Jose Road property rather than the Dimeo Lane property. Moreover, the amount of time to close escrow on each property was not so unreasonable as to constitute a breach of duty. Corman explained that the purpose of Section 6 was "to see if any estate tax advantage can be gained by deferring distribution for six months" and it relates to the alternate valuation date. Corman testified that setting up two separate subtrusts was mandatory. However, he believed that the failure to do so was not necessarily a breach of duty. He also testified that Liane was not required to divide the trust into separate equal shares until the estate was actually administered. In his view, Liane was not required to pay rent for the Old San Jose Road property while trying to sell the Dimeo Lane property.

Russell H. Marshall, a professional fiduciary, testified as an expert witness on trust administration and fiduciary standards of care. He was unable to state a typical range of

8

time to administer a trust because there are too many factors. In his experience, the shortest time to administer a trust was eight or nine months, and the trust in that case was funded by publicly-traded securities and did not include real property. According to Marshall, preliminary distributions of trust assets are quite common and there need not be language in the trust authorizing such distributions. When one of the trust beneficiaries occupies estate real property, costs such as utilities, maintenance, and taxes are charged to the beneficiary. However, capital improvements and repairs to get the house ready for sale are charged to the estate. In his view, Andrea was not damaged by the decline in value of the Dimeo Lane property, because the property generated income and she would receive a net gain of $11,905.

Marshall also testified that the language in the Trust giving Andrea one-half share of the net distributable estate is mandatory. However, the Trust does not bequeath the Dimeo Lane property to Andrea, and it was not mandatory that Andrea's annuity be funded out of the sale proceeds of the Dimeo Lane property. In his experience, it was not economically desirable to make interim purchases of smaller annuities rather than a single large purchase. Marshall thought that Liane should have hired a real estate broker to sell the Dimeo Lane property and that it was not reasonable to advertise on Craigslist.

In referring to Section 6, Marshall testified that the purpose of this paragraph was "to allow the trustee to defer distribution until the alternate valuation date for estate tax purposes." He also testified that Section 6 "gives the trustee discretion to delay until it's reasonable to make the distribution." He opined that Section 6 did not require Liane to close out the Trust within six months.

According to Marshall, it is not "correct practice" for a trustee to pay personal expenses with trust funds and trust expenses with personal funds. However, if Liane's distributions to herself were less than half of the total Trust assets, there was no damage to Andrea. Since Liane did not have discretion to not create the subtrusts, the

9

distributions should have been made to the subtrusts. He also opined that Liane did not breach her duty to Andrea due to passage of time because she had been making efforts to liquidate the assets. Marshall further testified that Andrea's subtrust was to be funded with an annuity, not Dimeo Lane.

The parties stipulated that John Leder, a specialist at Massachusetts Mutual Wholesale, would testify that if one bought eight $100,000 annuities or one $800,000 annuity, the cost to the client would be the same.

Regarding Section 6, the parties also stipulated that the " alternate valuation date is an election which you can only make in the context of filing an estate tax return. So if you are not filing an estate tax return, for example, because your estate isn't big enough to reach -- in this case, the 2007 death -- reach the two-million-dollar gross asset threshold, then you are not making an alternate valuation day election."

## G. Liane's Testimony

Liane testified that the efforts she made to market the Old San Jose Road property were similar to those that Loren had made. When she was unable to sell the Dimeo Lane property, she began trying to sell the Old San Jose Road property. She engaged a real estate broker in June 2008, who told her that she needed to make certain improvements on the property. The listing price was at the upper end of the range of the broker's market analysis. After Liane sold the Old San Jose Road property in May 2009, she paid off various debts. However, there were insufficient funds for Andrea's share, and she was unable to obtain a loan on the Dimeo Lane property to raise these funds. The City eventually made the highest offer. Liane was unable to sell the Ford F650 truck until the beginning of 2010. She was able to preserve the income stream from the Dimeo Lane property after Loren's death. Liane understood that she was to divide the trust in two

10

equal shares.  However, she explained that she could not have done so because she was still selling assets.

## II.  Statement of the Case

In August 2008, Andrea brought an amended petition that alleged causes of action for accounting, breach of trust, and removal of trustee.  The first cause of action alleged: Liane failed to provide an accounting within sixty days after Loren's death; Andrea requested an accounting on January 18, 2008; Liane provided an accounting on May 9, 2008; and the accounting failed to comply with the requirements of Probate Code section 16063.  It was also alleged that the accounting failed to disclose all of the Trust assets.  This cause of action further alleged that Andrea had been damaged by Liane's failure to provide a timely and proper accounting.

The second cause of action alleged that Liane breached her fiduciary duties by (1) failing to provide a proper accounting, (2) failing to divide the Trust assets into two shares as required by the Trust, (3) failing to promptly sell the Dimeo Lane property and placing the proceeds into Andrea's share, (4) making distributions of approximately $40,000 to herself before the Trust assets were properly distributed to the subtrusts, (5) giving herself preferential treatment over other Trust beneficiaries by making significant distributions to herself but not to Andrea, (6) making over 160 separate distributions from the Trust to herself and then having the Trust borrow money from a third party, (7) mismanaging Trust assets, including failing to liquidate several motor vehicles that were wasting assets, (8) failing to make Trust assets productive, (9) failing to inform Andrea of her activities, including Trust distributions and Trust loans, (10) using Trust assets as her own assets, and (11) failing to administer the Trust according to its terms.  As a result of these breaches, Andrea alleged that she had been damaged in an amount to be proven at trial.  This cause of action further alleged that Liane's acts were willful, wanton,

11

malicious, and oppressive, thereby justifying an award of punitive damages. Prejudgment and postjudgment interest and attorney's fees were also sought.

The third cause of action alleged that Liane should be removed as the trustee because she had breached her fiduciary duties.

In November 2009, Andrea filed a motion for preliminary injunction in which she sought to enjoin Liane from distributing funds without a court order. She also sought an order directing Liane to deposit trust proceeds into a trust account. In January 2010, the trial court denied the request for a preliminary injunction, but ordered Liane to deposit Trust proceeds into a Trust bank account.

On January 29, 2010, Andrea filed a motion requesting that Liane return $141,276.79 in Trust funds. On February 22, 2010, Liane filed a Trustee's status report and opposition to the motion. On March 1, 2010, the trial court ordered Liane to file a verified accounting on March 15, 2010, which she did.

The evidentiary hearing on Andrea's motion requesting that Liane return Trust funds was held on March 1, May 28, June 17, and July 8, 2010.

On September 9, 2010, the trial court issued a tentative or initial statement of decision. The trial court found: "The two subtrusts have not been created, they have not been funded and, it was not until quite recently that the Dimeo Lane property was sold. [Liane] made distributions to herself, used trust funds to pay personal and family expenses, and failed to submit appropriate accountings." The trial court rejected Liane's argument that the Trust language was precatory. Thus, the trial court concluded that Liane had breached her fiduciary duties to Andrea by failing (1) to administer the Trust pursuant to the terms of the Trust (Probate Code, § 16000), (2) to deal impartially with the beneficiaries (Probate Code, § 16003), (3) to account (Probate Code, §16062, subd. (a)), (4) to administer the Trust solely in the interests of the beneficiary (Probate Code, § 16002, subd. (a)), and (5) to keep the Trust beneficiaries reasonably informed of

12

the Trust and its administration (Probate Code, § 16060). The trial court further found that Liane committed willful misconduct/gross negligence.

As to damages, the trial court found: "Damage calculations are challenging in light of the uncertainty as to the values of the subject properties, the uncertainty as to the real estate market, the uncertainty as to vehicle sale values, and the lack of evidence as to what annuity income would have been generated if the subtrusts would have been created and funded[] sooner. The Court does not accept that damages can be calculated on the basis of appraisals (with no guarantee of ever selling for the appraised values), with a legal interest addition of ten percent per year (in light of the Trust language calling for the creation of subtrusts and the purchasing of annuities). Additionally, there was no evidence presented to verify that the annuity income would exceed the received rental income of the Dimeo Lane property. In similar fashion, the evidence was inconclusive as to [Liane's] ability to sell the vehicles for any particular price, or to sell the Old San Jose Road property, at a particular price, at a particular time. Without conclusive evidence, in this regard, it is impossible to attribute specific damage to [Andrea] on these claims." However, the trial court did award Andrea $48,868, which represented the difference between the distributions that Liane made to herself ($317,866) and those she made to Andrea ($268,998), $6,259 for the first year of occupancy at the Old San Jose Road property, $4,338 for Liane's line of credit expenses, and $3,976 for unnecessary credit card expenses for a total damages award of $63,441. The trial court awarded attorney's fees to Andrea, but denied punitive damages and the request to remove Liane as trustee.

On November 17, 2010, there was a hearing to address the trial court's findings in its tentative statement of decision. At that time, the parties agreed that the evidentiary hearing would constitute a trial for all purposes.

On February 2, 2011, the trial court issued an amended statement of decision. The trial court reaffirmed its finding that Liane had breached her duty of care to Andrea. The

13

trial court rejected Andrea's argument that "the trustee should bear the loss in value of the Old San Jose Road property. That position is not consistent with the terms of the trust document. There were no specific land bequests within that document. The challenge, then, becomes whether the loss in value can be attributed to the breach of trust, or was caused by outside, external factors. Evidence was presented to verify a series of factors hindering the sale of each property. As a result, the Court cannot find that the alleged loss, or losses, regarding the real properties were caused by the breach. Those damages caused by the breach have been described by the Court in its original decision."

The trial court increased the amount of the damages award to $77,623.44. The trial court awarded (1) Andrea $11,000 credit for the tractor/trailer, (2) increased the rent for the Old San Jose Road property to $12,517.91, (3) awarded $4,976.65 for costs for the equity line of credit, (4) deleted the accounting charges of $3,976 for credit card purchases, and (5) awarded $260.88 for credit card interest. However, the trial court denied attorney's fees to Andrea, noting that it had found in favor of Liane on the issue of damages and that Liane successfully defended against several of Andrea's claims. Both parties filed objections to the amended statement of decision.

In April 2011, the judgment was filed. The trial court did not change its finding of liability, but again changed some of the damages figures. After crediting Liane for trust expenses, business expenses and property repairs, the trial court found that the difference in distributions between the two parties was $22,019.63. The trial court then reaffirmed its previous findings regarding rent on the Old San Jose Road property, costs for the equity line of credit, and credit card interest, and added these amounts to $22,019.63 for a total damages award of $39,775.07 to Andrea. The trial court denied attorney's fees to Andrea. It also denied prejudgment interest and punitive damages. Following entry of judgment, Andrea filed a timely notice of appeal.

14

## III. Discussion

### A. Damages

#### 1. The Old San Jose Property

Andrea contends that the trial court erred in its damages analysis of the Old San Jose Road property. She contends that, as a matter of law, the Trust language contains a specific land bequest of the Old San Jose property to Liane. Referring to the tentative statement of decision, she first argues that since this property transferred from Loren to Liane upon his death, the trial court's finding that she failed to provide sufficient evidence that Liane was able "to sell the Old San Jose Road property, at a particular price, at a particular time" was irrelevant. She claims that "[t]here is no legitimate reason why [she] should have to share in the loss of the value of [the property] solely allocated to Liane." Thus, she asserts that the loss of $206,370.63 (appraised value of $820,000 minus the sales price of $649,000 plus $35,370.63 of sales costs) on this property should have been allocated to Liane.[4] In response, Liane argues that the Trust language was ambiguous and that the trial court properly considered extrinsic evidence to conclude that Loren intended to provide the trustee with flexibility as to the division of the Trust assets.

"'In construing a trust instrument, the intent of the trustor prevails and it must be ascertained from the whole of the trust instrument, not just separate parts of it.' [Citations.] . . . Each case depends upon its own peculiar facts and thus case precedents have little value when interpreting a trust. [Citation.]" (*McIndoe v. Olivos* (2005) 132 Cal.App.4th 483, 487.) In reviewing a trial court's construction of a trust, "we are free to

---

[4] Andrea also claims that the trial court's finding that the Trust language is mandatory in setting forth the trustee's duties in the tentative statement of decision is contradicted by its finding in the amended statement of decision that there were no specific land bequests. However, a tentative statement of decision is not binding on the trial court and may be modified. (See *Khan v. Superior Court* (1988) 204 Cal.App.3d 1168, 1173, fn. 4.) Thus, to the extent that the amended statement of decision contradicts the tentative statement of decision, the amended statement of decision is controlling.

15

independently interpret the instrument as a matter of law *unless* the trial court's interpretation turned upon the credibility of extrinsic evidence or required resolution of a conflict in the evidence." (*Estate of Verdisson* (1992) 4 Cal.App.4th 1127, 1135 (*Verdisson*).) Where a written instrument is ambiguous and the court receives conflicting extrinsic evidence as an aid in resolving the ambiguity, we apply the substantial evidence rule to any factual findings made by the trial court. (*Estate of Dodge* (1971) 6 Cal.3d 311, 318-319.) In conducting a substantial evidence review, we resolve any conflicts and draw all legitimate and reasonable inferences in favor of the judgment. (*Estate of Bristol* (1943) 23 Cal.2d 221, 223.)

Here, section 9 of the Trust uses the word "shall" in setting forth the powers of the trustee. Section 2 uses the same word, stating that, in the event Liane survives Loren, the trustee "shall allocate and divide the remaining balance of the Trust Estate into two equal shares:" one for Andrea and one for Liane. These provisions are thus set forth in mandatory terms. However, the word "shall" is not used in outlining the disposition of the Old San Jose Road property. Instead, this clause of Section 2 states: "Should the [Old San Jose Road property], be an asset of the Trust Estate upon this allocation and division, and should that asset not comprise more than one-half (1/2) the value of the net Trust Estate following the expenses of the administration of the Trust following the death of the Grantor, including but not limited to his debts, any taxes that may be due, and the costs of administration, it is the Grantor's intention that the residence be allocated to the share for his wife." In our view, the failure to use the word "shall" coupled with the qualifying phrase "should that asset not comprise more than one-half (1/2) the value of the net Trust Estate" created some ambiguity as to the disposition of this asset. Thus, the trial court properly considered extrinsic evidence to resolve ambiguity in the Trust language.

16

This extrinsic evidence consisted of the testimony of Corman, who drafted the Trust and the Amendment for Loren. He testified that since Loren believed the Dimeo Lane property was worth more than half the estate, Loren hoped that Liane would live at the Old San Jose Road property, sell the Dimeo Lane property, and use the sale proceeds to fund an annuity for Andrea and living expenses for herself. Corman explained that he used the term "settlor's intention" as a precatory term, that is, "to indicate this is what [he]'d like to have happen if it's at all possible." Corman further testified that if Loren had wanted the Old San Jose Road property to go into the share for Liane, the Trust would have stated that the trustee shall allocate the Old San Jose Road property to Liane. According to Corman, "[t]he intention was clearly that we had two beneficiaries and we wanted to wind up with both of them having half and they were both beneficiaries from day one. . . . If Dimeo Lane turned out to be a problem and we needed to have liquidity and the house would sell easier, th[e]n we shifted gears and tried for the house." Since there was substantial evidence to support the trial court's finding that Liane was not required to allocate the Old San Jose property to her subtrust, we reject Andrea's contention that a loss of $206,370.63 should have been allocated to Liane.

## 2. The Dimeo Lane Property

Andrea next contends that the trial court erred in its damages analysis regarding the Dimeo Lane property. She argues that the Trust required the property to be sold and the proceeds allocated to her. She further argues that since the property, including the mobile home, was appraised at $845,000 at the time of Loren's death and there were no external factors hindering the sale of the property, she is entitled to damages of $126,700 ($845,000 minus the sales price of $718,300).

We first consider the language of the Trust. Section 2 provided in relevant part: "Should the [Dimeo Lane property] be an asset of the Trust Estate upon this allocation and division, it is the Grantor's intention that this property be sold as soon as it is

17

reasonable to do so, and the resulting liquid assets be used to fund the share for the Grantor's daughter." The language in this clause is similar to that used regarding the Old San Jose Road property, that is, the failure to use the word "shall." As previously discussed, the trial court properly considered Corman's testimony and concluded that Loren did not specifically bequeath the sales proceeds of the Dimeo Lane property to Andrea.

As to the value of the Dimeo Lane property, the trial court noted that there was "uncertainty as to the values of the subject properties, the uncertainty as to the real estate market," and rejected Andrea's claim that "damages can be calculated on the basis of appraisals (with no guarantee of ever selling for the appraised values)." This court reviews the trial court's factual findings in the statement of decision under the substantial evidence standard. (*SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 462 (*SFPP*).)

Here, there was substantial evidence to support the trial court's rejection of the evidence of the appraised value of this property as well as its finding that the real estate market for the Dimeo Lane property was uncertain. When Loren executed exhibit B a month before his death, there was an agreement to purchase the Dimeo Lane property for $1.2 million. However, the buyer backed out of this agreement, and the City made an offer of $500,000, which was the only offer that Liane received on this property shortly after Loren's death. Moreover, the property had a history of nonconforming uses by tenants, significant access problems, and serious environmental issues. The City had also expressed interest in acquiring the property by eminent domain. As Corman explained, "[I]t's nice to say that you can get appraisals fairly close to date of death, but that isn't reality either. Because again, the market went down for both properties. The City's interest continued in Dimeo Lane. In my opinion, it drove away buyers. The problems with the uncertainty of the property created difficulties that I don't think either the

18

decedent or I had any idea this could happen." Thus, there was substantial evidence to support the trial court's findings regarding the value of the Dimeo Lane property.[5]

### 3. Trial Court's Damages Analysis

Andrea also contends that the trial court erred in failing to restore her to what she would have received had the Trust been properly administered. She contends that instead of receiving $871,726.51[6] of the Trust estate, she received $692,773.86.[7]

Probate Code section 16440 outlines the measure of liability for a breach of trust. Subdivision (a) of that section states: "If the trustee commits a breach of trust, the trustee is chargeable with any of the following that is appropriate under the circumstances: [¶] (1) Any loss or depreciation in value of the trust estate resulting from the breach of trust, with interest. [¶] (2) Any profit made by the trustee through the breach of trust, with interest. [¶] (3) Any profit that would have accrued to the trust estate if the loss of profit is the result of the breach of trust." (Probate Code, § 16440, subd (a).)

---

[5] Andrea's assertion that the parties stipulated that the value of the Dimeo Lane property was $845,000 for nine months after Loren's death is contested by Liane. At trial, Liane stipulated that the value of the Dimeo Lane property "did not start to go down until nine months after Loren died." At the hearing on the objections to the tentative statement of decision, Liane's counsel referred to Andrea's characterization of the stipulation: "There's not an $845,000 number in there. Their evaluation of Dimeo Lane at date of death was 760,000. Even if someone had ever asked me to stipulate to 845, there's no reason on earth I would have done so except maybe if I had been Tased first." "Neither the responsibility nor the duty of the court to render a just judgment should be shifted to counsel in the case. While it is entirely proper for the court to accept stipulations of counsel which appear to have been made advisedly, and after due consideration of the facts, the court cannot surrender its duty to see that the judgment to be entered is a just one, nor is the court to act as a mere puppet in the matter." (*City of Los Angeles v. Harper* (1935) 8 Cal.App.2d 552, 555.) Given Liane's counsel's statement and the uncertainty of the record, there was sufficient cause for the trial court to reject the stipulation as to the value of this property.

[6] One-half of the value of the Trust assets, minus liabilities at date of death, minus reasonable administrative fees equals approximately $871,726.51.

[7] Predistributions, plus one-half of the amount left in the Trust, plus damages equals approximately $692,773.86.

19

Andrea's calculation of damages is based on the following premises: (1) the Dimeo Lane and the Old San Jose Road properties were specifically bequeathed to Andrea and Liane respectively, (2) damages could be calculated on the basis of appraisals, (3) the annuity income would have exceeded the income from the Dimeo Lane property, (4) damages were proximately caused by Liane's breaches of duty, and (5) the Trust assets were to be divided and distributed within six months of Loren's death.

We have already concluded that substantial evidence supported the trial court's findings regarding specific land bequests and the appraisals of the properties. As to the annuity income, Andrea presented no evidence as to the amount of income that an annuity would have produced and thus there was no basis on which the trial court could have determined whether the annuity income was less than the rental income generated by the Dimeo Lane property.

We next consider the issue of whether Andrea carried her burden to prove damages proximately caused by Liane's breach of duties. In general, the trustee owes the beneficiaries of a trust certain codified duties, including the duty of loyalty, the duty to avoid conflicts of interest, the duty to preserve trust property, the duty to make trust property productive, the duty to dispose of improper investments, and the duty to report and account. These duties are set forth in the Probate Code. (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 462; Probate Code, §§ 16000-16015.) "The violation by a trustee of any duty owed to the beneficiaries of the trust constitutes a breach of trust. [Citation.]" (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, *supra*, 68 Cal.App.4th at p. 462; Probate Code, § 16400.) However, in order to prevail on a cause of action for breach of a fiduciary duty, "there must be shown the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach. The absence of any one of these

20

elements is fatal to the cause of action." (*Pierce v. Lyman* (1991) 1 Cal.App.4th 1093, 1101.)

Here, the trial court found that though it had been approximately three years since Loren's death, "[t]he two subtrusts have not been created, they have not been funded and, it was not until quite recently that the Dimeo Lane property was sold. [Liane] made distributions to herself, used trust funds to pay personal and family expenses, and failed to submit appropriate accountings." Thus, the trial court concluded that Liane breached her duties to: (1) administer the Trust pursuant to the Trust terms (Probate Code, § 16000), (2) deal impartially with the beneficiaries (Probate Code, § 16003), (3) account (Probate Code, § 16062, subd. (a)), (4) administer the Trust solely in the interests of the beneficiary (Probate Code, § 16002, subd. (a)), and (5) keep the Trust beneficiaries reasonably informed of the Trust and its administration (Probate Code, § 16060).

However, the trial court also found that since "[e]vidence was presented to verify a series of factors hindering the sale of each property," it could not find "that the alleged loss, or losses, regarding the real properties were caused by the breach." Thus, the depreciation in value of these assets was not caused by Liane's breach of duty. Similarly, Andrea failed to establish that Liane's distribution of Trust funds to herself and Andrea rather than creating and funding the subtrusts caused damage to her. Moreover, Liane's distributions to herself to pay personal and family expenses did not exceed the amount to which she was entitled under the terms of the Trust and the distributions to Andrea allowed Andrea to purchase her own annuity if she chose. In addition, Andrea presented no evidence that Liane's failure to make appropriate accountings caused her damage. Thus, the trial court did not err in its calculations of damages caused by Liane's breach of duties.

21

Andrea also argues that "the overall Trust estate should be valued no later than six months after Loren's death" and that this value was established in the second revised accounting.[8]

Section 6 provided: "Whenever the Trustee is directed to make a distribution of trust assets or division of trust assets into separate trusts or shares on the death of a Grantor, the Trustee may, in the Trustee's discretion, defer that distribution or division until six (6) months after the Grantor's death *or for a longer period if the circumstances warrant this delay*." (Italics added.)

Here, expert testimony established that the purpose of Section 6 was to provide an alternate valuation date for tax purposes. However, we independently interpret the Trust to determine whether it required the trustee to distribute or divide the Trust assets within six months. (*Verdisson*, *supra*, 4 Cal.App.4th at p. 1135.)

Even if we assume that Section 6 did not pertain solely to the tax consequences of the Trust assets, Section 6 authorizes deferral of the distribution or division of these assets in the trustee's discretion for a period longer than six months "if the circumstances warrant this delay." The trial court specifically found that "there were a series of factors hindering the sale of each property," thereby delaying distribution of the Trust assets. The record establishes that, despite an appraisal of $800,000, the County offered $500,000 for the Dimeo Lane property shortly after Loren's death. Moreover, as previously discussed, there were several significant environmental and zoning factors that reduced the pool of potential buyers and delayed the sale. Substantial decreases in real estate values also prevented Liane from selling the Old San Jose Road property to raise

---

[8]    Though requested by the parties, the trial court declined to decide whether Section 6 required division or distribution of Trust assets within six-months after Loren's death. Thus, the doctrine of implied findings, which requires a presumption in favor of the factual decisions in the judgment, is inapplicable when omissions and ambiguities in the statement of decision are brought to the court's attention. (*SFPP*, *supra*, 121 Cal.App.4th at p. 462.)

funds to purchase an annuity for Andrea's subtrust. In exercising our independent review, we conclude that Section 6 did not require division or distribution of the Trust assets no later than six months after Loren's death.

Relying on *Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866 (*Uzyel*), Andrea next contends that she was entitled to damages to deter Liane and other trustees from committing a breach of trust. In *Uzyel*, there were several issues relating to the trustee's liability for breach of trust. (*Id.* at p. 878.) One of the issues involved whether the plaintiffs were entitled to appreciation damages. (*Id.* at p. 907.) Among other things, the trustee sold 37,500 shares of stock in the trust for approximately $801,000 in May 1992. (*Id.* at p. 882.) The trustee also repaid part of his personal " 'loans' " from the trust in the amount of $677,776.96. (*Ibid.*) The trustee then made a $1.4 million loan from the trust to a fictional borrower, but this money was actually used by the trustee to repay $1,471,936.63 that the trustee owed to the trust based on his personal " 'loans' " from the trust. (*Ibid.*) After finding that the trustee had breached both his duty to invest prudently and his duty of loyalty, the trial court concluded that the plaintiffs were entitled to treat the May 1992 sale as if it had not occurred and awarded them $35,389,242, which was based on the value of the stock in September 2000. (*Id.* at pp. 903-904.)

*Uzyel* rejected the trustee's argument that a prudent investor would have sold the stock in May 1992, and thus the plaintiffs were not entitled to damages. (*Uzyel*, *supra*, 188 Cal.App.4th at pp. 907-908.) Andrea focuses on the following reasoning in *Uzyel*: "The remedy for breach of trust should be adapted 'to fit the nature and gravity of the breach and the consequences to the beneficiaries and trustee.' [Citation.] The goals of the remedy are not only to compensate the beneficiaries for their loss, but also to deter the trustee in question and other trustees from committing similar acts. [Citation.] Particularly with respect to the duty of loyalty, 'the principal object of the administration of the rule is preventative, to make the disobedience of the trustee to the rule so

prejudicial to him that he and all other trustees will be induced to avoid disloyal transactions in the future.' [Citation.]" (*Id.* at p. 907.)

Here, the trial court noted in its amended statement of decision that it had read *Uzyel*, *supra*, 188 Cal.App.4th 866 and found that any alleged losses in connection with the real properties were not caused by Liane's breach of duty. The trial court did not refer to damages to deter Liane or other trustees from committing breach of trust. However, *Uzyel* is distinguishable from the present case; the nature and gravity of Liane's conduct was clearly not as reprehensible as that of the trustee in *Uzyel*. Accordingly, we find no error.

Andrea also contends that the trial court "refused to look at the overall impact of Liane's conduct and instead focused on the value of each individual asset. In examining each asset, the trial court improperly required Andrea to prove certainty with respect to the loss, and improperly refused to award damages where the exact amount could not be proven."

"The requirement that damages be 'certain' and not 'speculative' or 'conjectural' is more important in contract than in tort actions, but it does apply to the latter as well. [Citations.] [¶] However, though the *fact* of damage must be clearly established, the *amount* need not be proved with the same degree of certainty, but may be left to reasonable approximation or inference. Any other rule would mean that sometimes a plaintiff who had suffered substantial damage would be wholly denied recovery because the particular items could not, for some reason, be precisely determined. [Citations.]" (6 Witkin, Summary of Cal. Law (10th ed 2005) Torts, § 1551, p. 1024.)

We disagree with Andrea's characterization of the trial court's analysis. The trial court rejected Andrea's argument as to specific land bequests, noted the uncertainty in the real estate market, and concluded that the alleged losses regarding the real properties

24

were not caused by Liane's breach of duty. Thus, the trial court found that Andrea failed to establish the fact of damage.

In sum, we conclude that the trial court properly calculated the damages caused by Liane's breach of duty.

## B. Prejudgment Interest

Andrea argues that the trial court erred in its refusal to award prejudgment interest under Probate Code section 16440. She contends that the loss in value of her share of the Trust assets totals $178,851.65, and that she is entitled to interest on that amount from December 16, 2007 through the date of judgment on April 1, 2011 at the rate of 10 percent for a total of $58,947.54.

Probate Code section 16440, subdivision (a) provides for prejudgment interest on an award of "[a]ny loss or depreciation in value of the trust estate resulting from the breach of trust." However, since we have concluded that Andrea was not entitled to the depreciation in the value of the real properties, we also conclude that she is not entitled to prejudgment interest for depreciation of the Trust assets pursuant to Probate Code section 16440.

Relying on Civil Code section 3287, Andrea contends that the remaining Trust assets totaled $692,874.86 ($871,726.51 minus $178,851.65), and that she is entitled to interest on that amount from December 16, 2007 through January 7, 2010, at the rate of 7 percent for a total of $100,191.89, as well as interest on $423,876.07 from January 8, 2010 through April 1, 2011, at 7 percent, which equals $36,499.79.

"Civil Code section 3287, subdivision (a) provides that a party is entitled to recover prejudgment interest on an amount awarded as damages from the date that the amount was both (1) due and owing and (2) certain or capable of being made certain by calculation. [Citations.] The primary purpose of an award of prejudgment interest is to

compensate the plaintiff for the loss of use of money during the period before the entry of judgment, in order to make the plaintiff whole. [Citations.] [¶] Damages are certain or capable of being made certain by calculation, or ascertainable, for purposes of Civil Code section 3287, subdivision (a) if the defendant actually knows the amount of damages or could compute that amount from information reasonably available to the defendant. [Citation.] A readily ascertainable market value can satisfy this requirement. [Citation.] In contrast, damages that must be judicially determined based on conflicting evidence are not ascertainable. [Citations.] A legal dispute concerning the defendant's liability or uncertainty concerning the measure of damages does not render damages unascertainable. [Citations.] On appeal, we independently determine whether damages are ascertainable for purposes of the statute. [Citation.]" (*Uzyel*, *supra*, 188 Cal.App.4th at p. 919.)

Here, the trial court found: "As to prejudgment interest, the Uzyel opinion, referenced previously, confirms that such an award is appropriate, if the pre-judgment damages are readily ascertainable per Civil Code Section 3287 (Uzyel, at page 875). A second challenge presented, per Civil Code Section 3287(a), is how to determine when the allegedly ascertainable amount became due and owing. The Court finds that neither prong is satisfied, as the evidence confirmed uncertainty as to both the damage figures and when such damages became due and owing."

Since we have concluded that the Trust did not require Liane to divide and distribute the assets within six months after Loren's death, we reject Andrea's argument that the remaining assets of $692,874.86 were due and owing during that six-month period. As to Andrea's claim that Liane still has not distributed $423,876.07, we have rejected her contentions on which she has based Liane's liability for that amount. We further note that the tentative statement of decision awarded Andrea $63,441, the amended statement of decision awarded her $77,623.44, and the judgment awarded her $39,775.07. Thus, the present case presented circumstances in which the damages were

26

based on conflicting evidence and thus not ascertainable.  Accordingly, the trial court properly declined to award prejudgment interest pursuant to Civil Code section 3287.

### C.  Attorney's Fees

Noting that the trial court found that Liane committed willful misconduct and gross negligence in the management of the Trust, Andrea contends that she was entitled to an award of attorney's fees.

Probate Code section 17211, subdivision (b) provides:  "If a beneficiary contests the trustee's account and the court determines that the trustee's opposition to the contest was without reasonable cause and in bad faith, the court may award the contestant the costs of the contestant and other expenses and costs of litigation, including attorney's fees, incurred to contest the account.  The amount awarded shall be a charge against the compensation or other interest of the trustee in the trust.  The trustee shall be personally liable and on the bond, if any, for any amount that remains unsatisfied."

As *Uzyel* explained:  "[W]e believe that reasonable cause to oppose a contest of an account requires an objectively reasonable belief, based on the facts then known to the trustee, either that the claims are legally or factually unfounded or that the petitioner is not entitled to the requested remedies.  Conversely, there would be no reasonable cause to oppose a contest of an account only if all reasonable attorneys would have agreed that the opposition was totally without merit, or, in other words, no reasonable attorney would have believed that the opposition had any merit.  As with probable cause, we independently review the trial court's finding on the existence of reasonable cause absent any factual dispute as to [the trustee's] knowledge at the time.  [Citations.]"  (*Uzyel*, *supra*, 188 Cal.App.4th at p. 927.)

Here, the trial court found that Liane's defense was not without reasonable cause because it made various findings in her favor on the issue of damages.  We agree.  Based

27

on the facts then known to Liane, she had an objectively reasonable belief that Andrea's claims were legally unfounded, that is, that Andrea's claim that any alleged losses regarding the real properties were caused by Liane's breach of duty and that she was not entitled to the requested remedy. Accordingly, the trial court did not err in denying an award of attorney's fees to Andrea.

## IV.  Disposition

The judgment is affirmed.

_____
Mihara, J.

WE CONCUR:

_____
Elia, Acting P. J.

_____
Márquez, J.